UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**TERRY L. MARCADES**                                    **CIVIL ACTION**

**VERSUS**                                                        **NO. 15-1144**

**UNUM LIFE INSURANCE**                               **SECTION "K"(3)**
**COMPANY OF AMERICA**

<u>**ORDER AND REASONS**</u>

Before the Court are cross-motions for final judgment based upon the administrative record filed by Plaintiff Terry L. Marcades ("Plaintiff") and Defendant UNUM Life Insurance Company of America ("Defendant" or "UNUM"). *See* Rec. Docs. 26 & 30. The Court granted the joint motion of the parties to submit Plaintiff's claims against UNUM for decision based upon the administrative record and cross-motions for final judgment. Rec. Doc. 22. Having reviewed the relevant law, the pleadings, and the administrative record, the Court rules that Plaintiff is entitled to a reinstatement of disability benefits; however, upholds UNUM's determination that it may properly reduce those benefits based on "franchise fees" received by Plaintiff from his wholly held corporation.

**I. FACTUAL BACKGROUND**

*A. Initial Background*

In September 1991, Plaintiff was employed as a pest control sales agent for Redd Pest Control when his work truck was hit from behind in a high-speed rear-ending on Interstate 10. UA 1859; UA 2390.[1] Plaintiff was diagnosed with cervical and low back strain and referred to physical therapy. Thereafter, he continued to work until October 1994, when Plaintiff filed a

---

[1] The Court abbreviates its citations to the administrative record by simply including the prefix "UA" followed by the pertinent bates number or numbers.

1

claim for disability benefits associated with a spine surgery (a "left hemilaminectomy at the L5-S1 vertebrae") meant to address his complaints of "numbness, paresthesias, and pain into legs and testicles." *Id.* Plaintiff's employer held a Group Long Term Disability Insurance Policy ("Policy") with UNUM that covered Plaintiff's disability claim. *See* UA 270–297.

*B. The Policy*

The Policy in pertinent part states that "'[d]isability' and 'disabled' mean that because of injury or sickness the insured cannot perform each of the material duties of his regular occupation." UA 279. The Policy provides for weekly benefits for a limited period following the disability determination, to be replaced by monthly benefits in the case the disability persists. UA 272 & 281. The Policy further provides, after the first twelve months of monthly benefit payments, for reductions to monthly benefit payments, "if the insured is earning more than 20% of his indexed pre-disability earnings in his regular occupation or another occupation, then the monthly benefit will be figured by [a stated formula].[2]" *Id.*

*C. Claim History*

Plaintiff's claim for disability benefits was approved and he began receiving weekly benefits in November 1994. UA 2389. In late January 1995, Plaintiff began receiving monthly disability benefits. UA 787.

In October 1996, UNUM terminated Plaintiff's monthly disability benefits on the grounds that he was able to return to work as a "Pest Control Sales Person." UA 2468–69. UNUM noted that the occupation is "light and requires significant standing and walking and lifting and carrying up to 10 pounds frequently and 20 pounds occasionally." *Id.* UNUM further stated that occupation required "the need to climb, crouch and reach on an occasional non-

---

[2] Because the parties do not dispute how the reduction is calculated, the Court finds it unnecessary to elaborate the deduction formula provided for in the Policy.

frequent basis." *Id.* UNUM stated that an independent medical exam by Dr. Clifford Ameduri indicated that Plaintiff was able to meet these requirements, noting that "[t]he traumatically caused myofascial trigger points should not represent an impairing condition and have not been maximally treated." *Id.*

Plaintiff appealed and monthly benefits were reinstated. UA 2198–2203. A UNUM memorandum from January 1997 regarding the reinstatement of benefits indicates the reason for reinstatement was a determination that UNUM's claims reviewers used an incorrect description of Plaintiff's occupation. *Id.* The memorandum notes:

> The policyholder indicated that [Plaintiff's] job as a pest/termite salesman required bending, crawling, stooping, climbing, and reaching using small hand tools. [Plaintiff] would have to physically crawl under a house and make a detailed inspection. The policyholder indicated that the requirements of [Plaintiff's] job were similar physically to those of a servicing technician.

*Id.* The UNUM memorandum also notes that additional medical information indicated that Plaintiff "remained totally disabled due to cervical disc disease with a bilateral C7 radiculopathy as well as ulnar entrapment of the elbow." *Id.* Plaintiff's file was returned to a vocational consultant on appeal, who—using a labor market survey to identify the requirements of Plaintiff's occupation—indicated that Plaintiff's occupation did require "frequent kneeling, stooping, and crawling (40-50% job duties [sic]" and that "[c]rawling is required in virtually all residential inspections." *Id.*

The memorandum summarizing the appeal recommended that UNUM consider an "activities check," in light of an evaluation indicating that Plaintiff exercised three times per week in a manner possibly inconsistent with Plaintiff's listed disabilities. *Id.* The record reflects that UNUM conducted periodic, discrete surveillance of Plaintiff's whereabouts and activities over the years following 1996. UA 2100–31; UA 2145–50. In June 1999, Plaintiff underwent a

second surgery, this time "anterior cervical discectomy." UA 2016; UA 2024–25. Following the surgery, Plaintiff's treating neurologist indicated Plaintiff could work at a light functional capacity that could include occasional bending, kneeling, crawling, reaching and walking on uneven surfaces, so long as there was no climbing or lifting or carrying of items over 20 pounds.

In September 1999, UNUM once again terminated Plaintiff's benefits. UA 2016–17. The letter notifying Plaintiff of the termination stated that the physical requirements of his occupation as a "Pest Control Sales Agent" required the ability to lift up to 20 pounds, frequent reaching, handling, and fingering, and occasional stooping and crouching. *Id.* UNUM stated that the information provided by Plaintiff's treating physician, Dr. Trahant, indicated that he could work full time, so long as he was not required to climb, lift, or carry over 20 pounds. *Id.* UNUM stated that Dr. Trahant's information indicated that Plaintiff could occasionally bend, kneel, crawl, reach above shoulders, walk on uneven surfaces and could frequently bend or kneel. *Id.* Finally, UNUM stated that the information from Plaintiff's surgeon, Dr. Connolly, indicated that Plaintiff was "well-healed and stable" and could return to work with a restriction on heavy or prolonged lifting overhead. *Id.* UNUM states that Dr. Connolly's information indicated that Plaintiff could "sit, stand, walk with ease and that crawling, as required in your occupation, is okay." *Id.*

Plaintiff again appealed, including with his appeal an updated MRI showing a lumbar disc herniation at L3-4 and an updated report from Dr. Trahant stating that Plaintiff could never return to work. UA 1697. During the pendency of the appeal in April 2000, UNUM continued its surveillance of Plaintiff and obtained a video of Plaintiff conducting a variety of activities, including walking with two garbage cans in each hand while talking on the phone, walking without a limp, bending, squatting, sitting, and carrying other objects. UA 2101–12. UNUM's surveillance report indicates that on one occasion while Plaintiff was visiting a doctor's office,

he walked with a limp, but that Plaintiff otherwise performed all other activities without any sign pain or discomfort. *Id.* In May 2000, Plaintiff was subjected to an independent medical exam by Dr. John McCain, who indicated that Plaintiff "has a complex case" and questioned some of Plaintiff's self-reported capabilities after review of Plaintiff and his medical history record. UA 1876–83. Dr. McCain's report states that Plaintiff's "perceived level of disability has been reinforced by many of his previous physicians and due to these factors it would be difficult to know exactly by one examination what he is functionally capable of." *Id.* Dr. McCain's report also states:

> In regards to his previous job as a termite inspector, [Plaintiff] should be capable of driving short distances and performing sedentary duties that don't require prolonged positioning. With regards to crawling, he would certainly be unable to perform this with the history of possible instability in his lumbar spine.

*Id.* Dr. McCain recommended that Plaintiff undergo a functional capacity evaluation. *Id.*

Plaintiff underwent a functional capacity evaluation by occupational therapist, Christine Rangel in June 2000. UA 1894–1903. That evaluation indicated that Plaintiff could not perform sustained squatting, but that he could tolerate "sustained bending, repetitive bending-stooping, overhead reaching, forward reaching, repetitive reaching, crawling, kneeling, trunk pivot twisting, pulling, and floor to standing transfers on an occasional basis." *Id.* The evaluation noted "[e]vidence of possible submaximal effort and symptom magnification behaviors, and inconsistencies during musculoskeletal testing were present during the evaluation." *Id.*

UNUM had Plaintiff's recent evaluations and surveillance reviewed by a clinical consultant in late June 2000. UA 1859–61. That review indicated that there were inconsistencies between Plaintiff's stated levels of capacity and actual capacity, but also noted that Dr. McCain's assessment and limitations were reasonable and consistent with Plaintiff's evaluations and the

surveillance footage of his activities. *Id.* UNUM decided it was appropriate to reinstate benefits to Plaintiff.[3]

*C. The Instant Termination of Benefits*

UNUM continued to pay benefits to and receive disability reports from Plaintiff and his treating physicians until 2012 without incident. *See* Rec. Doc. 30-1 at 7; *see* Rec. Doc. 26-1 at 1–7. In August 2012, Plaintiff submitted a disability status update to UNUM reporting that he was performing "landscape consulting" at residences and earning $700 per month in cash. UA 159. UNUM decided to investigate Plaintiff's claim for disabilities after conducting an Internet search, which indicated that Plaintiff was the "Principal" of "T Marcades, Ltd.," an entity with an estimated three employee and annual revenue of $120,000. UA 217; UA 231.

In February 2013, UNUM employed a vocational rehabilitation consultant, Robin Giese, to perform an occupational review of the occupational demands of a "Pest Control Sales Representative." UA 253–56. That review noted that the "Job as Performed with the Employer" required the employee to "identify prospects for service, cold call prospective, inspect premises, prepare contracts, quote prices and coordinate initiation of treatment." *Id.* The review noted that Plaintiff described the job as requiring the employee to "crawl under the house, check attics and walk on roofs. Primarily responsible for home inspections." *Id.* The review, citing an "enhanced" Dictionary of Occupational Titles, stated that Plaintiff's "Pest Control Sales Representative" occupation required "frequent sitting with occasional standing and walking," occasional "light demand work," frequent reaching, handling and fingering, and occasional stooping and

---

[3] Neither party provides a citation to the record of UNUM's reinstatement of benefits in 2000. *See* Rec. Doc. 30-1 at 7; *see generally* Rec. Doc. 26-1. Because the parties do not dispute that the benefits were reinstated or indicate that UNUM's stated reason for reinstating benefits is relevant to the instant motions, the Court elected not to search the 2,685-page administrative record to find the record of UNUM reinstating benefits.

crouching. *Id.* The review notes that "occasional" means anywhere between zero and two and half hours per eight-hour workday. *Id.*

In March 2013, a UNUM representative spoke with Plaintiff over the telephone to discuss his claim. UA 298–99. The Plaintiff stated that his landscaping business was limited to consulting on garden beds and insects and spraying yards, that he was not doing any planting, that he was reporting income from landscaping on his tax return, and that his recent application for social security disability benefits had been denied. *Id.* Plaintiff gave a summary of his physical condition. *Id.* The UNUM representative explained that his disability benefits would not be altered by his landscaping business, so long as he was earning less than 20% of his pre-disability earnings, but did note that income above that figure would be offset if he made between 20% and 60% of his pre-disabilities earnings and that his benefits would be cut off if his income exceeded 60% of his pre-disabilities benefits. *Id.*

In July 2013, Plaintiff's treating physician, Dr. Keating produced a report opining that Plaintiff remained unable to work as a pest control salesman, because he was unable to lift or sit for prolonged periods, needs to move around, and could not get in awkward positions. UA 776.

In December 2013, UNUM requested additional surveillance of Plaintiff and received a surveillance report noting that he had visited a Home Depot store and pulled a flat-bed dolly with ten bags of topsoil and then loaded each bag into his truck. UA 1221. During that same period, UNUM had an on-site physician, Dr. Krell, review Plaintiff's file. UA 1258–61. Dr. Krell noted that Dr. Keating's recent reports indicated that Plaintiff was engaging in intense stationary bicycle riding, working on his core strength, staying active, and that his back pain was under control. *Id.* After also reviewing the recent surveillance footage of Plaintiff, Dr. Krell noted significant inconsistencies regarding Plaintiff's claim and then concluded that Plaintiff's record

did not document how Plaintiff would be precluded from full-time performance of "frequent sitting with occasional standing and walking, occasional exertion of up to 20 lbs, frequent reaching (occasional upward & downward), handling and fingering as well as occasional stooping and crouching." *Id.* The day after Dr. Krell entered his review, UNUM obtained a record indicating that Plaintiff has participated in the "Phoenix Regional Invitational Bowling Tournament" in both 2008 and 2009. UA 1284; 1274–1348.

Soon after, Dr. Krell sent Dr. Keating a series of questions regarding the basis for Dr. Keating opining that Plaintiff could not return to work. UA 1390–93. Dr. Keating reported that she had last seen Plaintiff in November 2013 when he was "having flare of back and right leg pain." *Id.* Dr. Keating stated that her 2013 opinion about Plaintiff's inability to return to his prior occupation was based on "Pain, he is unable to sit or stand for too long. He has neck and back pain c̄ DDD[4] on MRI." *Id.* Dr. Keating stated that her impressions regarding Plaintiff's functional capacity were based on "just what he reports." *Id.* Dr. Keating stated that she was not aware of Plaintiff's bowling activities or visit to the Home Depot. *Id.* Asked whether she thought Plaintiff would recover the capacity to work, Dr. Keating stated "unclear, he continues to have back pain since 2006 and [sic] before. he has flares of sciatica and staying in one position makes him uncomfortable." *Id.* Dr. Krell reviewed Dr. Keating's response and Dr. Keating's notes from Plaintiff's November 2013 visit and stated that he disagreed with Dr. Keating's opinion that Plaintiff was unable to return to his prior occupation. UA 1395–96.

Because UNUM's reviewing physician disagreed with Plaintiff's treating physician, UNUM had an additional physician, Dr. Sentef, review the disagreement. UA 1407–11; UA

---

[4] The Court has attempted to accurately capture Dr. Keating's handwritten script to the best of its abilities and notes that it takes judicial notice that DDD is a commonly used medical abbreviation for "degenerative disk disease." *See Audler v. Social Sec. Admin.*, Civ. A. No. 12-2883, 2014 WL 2611284 at *4 (E.D. La. Jun. 11, 2014) (Morgan, J.); *Smith v. Astrue*, 914 F. Supp. 2d 764, 771 (E.D. La. Aug. 31, 2012) (Africk, J.).

1456–63.[5] Dr. Sentef, citing Plaintiff's updated medical records and the surveillance information obtained by UNUM, concurred with Dr. Krell's opinion regarding Plaintiff's capabilities and had the capacity to "perform a light demand level occupation." *Id.*

UNUM conducted additional surveillance of Plaintiff's activities in March 2014. UA 1518–33. Plaintiff was surveilled carrying and tossing large waste bags. UA 1526. He was also surveilled driving with another individual to a private residence, then apparently conducting yardwork services, using garden tools, pulling weeds, and removing debris from under bushes. UA 1527. Over a period of roughly six minutes, Plaintiff was reportedly observed "repeatedly bent at the waist," pulling and tossing weeds, kneeling on the ground, crawling around bushes, squatting, applying pesticides, and gathering and tossing piles of weed. UA 1527–28. Plaintiff was later reportedly observed using his foot to push a yard sign into the ground and then ambulating around his yard normally. UA 1530–31.

UNUM contacted Dr. Keating to inquire about any change in condition of Plaintiff. UA 1581. Dr. Keating responded that Plaintiff "has not had [sic] a change in his condition." UA 1582.

UNUM then had Dr. Krell re-examine his prior opinion in light of the surveillance evidence, this time in light of the March 2014 surveillance video in which Plaintiff was noted, "to stand; walk; bend; enter and exit a truck; lifting, carry and toss garbage bags; rearrange items in the truck bed; kneel; pull weeds; carry a container; apply chemicals to a sidewalk and flower bed; pump a container of chemicals; apply chemicals to a sidewalk and flower bed; pump a container of chemicals; converse with another person; use a garden tool; toss weeds; relocate a lawn sign; adjust a hose and turn on a water sprinkler." UA 1583. Dr. Krell was asked to opine

---

[5] Because Dr. Sentef's initial review did not contain Dr. Keating's report from Plaintiff's November 2013 visit, Dr. Sentef filed two reviews.

9

whether Plaintiff could, on a "sustained, full-time basis" perform an occupation with requirements of "frequent standing, walking sitting; frequent bending, crawling, kneeling, stooping; frequent reaching, fingering, handling; occasional pushing/pulling, climbing stairs/ladders (to attics); occasionally lifting/carrying up to 20 pounds, frequently up 10 pounds, and constantly a negligible amount of weight." UA 1584.

Dr. Krell's report, entered at 1:08 p.m. on April 29, 2016, notes that his review of the March 2014 surveillance footage indicated: "standing, walking, carrying full garbage bags, driving, bending, kneeling and working on ground (pulling weeds), crawling, lifting and carrying sprayer (appears ½-full), pulling garden hose; none of the activities was characterized by hesitancy, imbalance, pain behaviors (grimacing, holding or rubbing part of body, abnormal gait, irregular motions suggestive of spasm); transitions among various postures were not characterized by hesitancy or other pain behaviors." UA 1585. Dr. Krell's report states:

> Though pushing and climbing were not documented, there are no findings of a condition that would preclude occasional performance of these activities. Frequent standing, walking, sitting; Frequent bending, crawling, kneeling, stooping; Frequent reaching, fingering, handling; Occasional pushing/pulling, climbing stairs/ladders (to attic)[;] Occasionally lifting/carrying up to 20 pounds, frequently up 10 pounds, and constantly a negligible amount of weight.

UA 1586. Dr. Krell then goes on to state:

> with a reasonable degree of medical certainty, there are no documented findings of a physical condition that would preclude sustained, full-time performance of the listed activities: Frequent standing, walking, sitting; Frequent bending, crawling, kneeling, stooping; Frequent reaching, fingering, handling; Occasional pushing/pulling, climbing stairs/ladders (to attic)[;] Occasionally lifting/carrying up to 20 pounds, frequently up 10 pounds, and constantly a negligible amount of weight?

*Id.*

That same day, UNUM requested that Dr. Sentef review Dr. Krell's updated report. UA 1588–1601. Dr. Sentef filed a report within hours, which stated that:

> Updated surveillance demonstrates significant functional abilities. I also reviewed the OSP addendum. My previous DMO opinion remains unchanged. The claimant is capable of sustained, full-time performance of the following listed activities which include frequent sitting with occasional standing and walking, occasional exertion up to 20 pounds, frequent reaching with occasional upward and downward, handling and fingering as well as occasional stooping and crouching. I concur with the OSP.

UA 1593. On May 5, 2014, UNUM responded to Dr. Sentef thanking him for the updated report, but clearly noting that Dr. Krell's April 29, 2014, report addressed physical capacities not covered in Dr. Sentef's April 29, 2014, report. UA 1595. Again within hours, Dr. Sentef produced the following one-paragraph response:

> I have reviewed all my DMO reviews, the OSP reviews, and the file information. Based on my review of the medical information available, the claimant is capable of performing the following physical duties on a sustained, full-time basis: Frequent standing, walking, sitting; Frequent bending, crawling, kneeling, stooping; Frequent reaching, fingering, handling; Occasional pushing/pulling, climbing stairs/ladders (to attic); Occasionally lifting/carrying up to 20 pounds, frequently up 10 pounds, and constantly a negligible amount of weight.

*Id.*

On May 27, 2014, UNUM sent a letter to Plaintiff's counsel stating that it would discontinue Plaintiff's benefits, effective May 28, 2014, and providing a justification for the decision essentially summarizing the information stated in the preceding paragraphs of this Order and Reasons. UA 1641–45.

On August 20, 2014, Plaintiff's counsel responded to UNUM requesting an appeal of UNUM's decision to terminate Plaintiff's benefits. UA 2534–35. In the response, Plaintiff's counsel asserted that UNUM's review was inadequate, because it had conducted "no actual medical examination or testing" of Plaintiff and improperly relied on "only two days of surveillance"—without any further investigation of the context of those events—to conclude that Plaintiff was capable of returning to work on a full-time basis. *Id.* Furthermore, Plaintiff's

counsel asserted that UNUM did not review the "actual job description or requirements of [Plaintiff's] former employment," yet UNUM's policy defined disability as meaning the insured "cannot perform **each** of the material duties of his regular occupation." *Id.* (emphasis in original). Plaintiff's counsel attached a letter from a former executive assistant of Redd Pest Control[6] stating that she worked closely with Plaintiff and that Plaintiff "was a salesman with job duties of Termite Technician, Fumigation Technician, and all sales for termite work." *Id.* Plaintiff's counsel also attached "a listing of the requirements and job description for his previous employment." *Id.*; UA 2536–64. Plaintiff's counsel asserts that job description required "exertion of up to 70 pounds of force," trench digging with a pick axe, lifting and carrying 70-pound items up to 100 feet and the "repetitive assumption of posture to access or pulling 1 inch from the floor of 2 to 6 times in a day." *Id.* Plaintiff's counsel asserted that UNUM's justification for its decision to terminate benefits did not indicate Plaintiff could meet those job requirements and concluded by asserting UNUM's decision was arbitrary and capricious and without probable cause. *Id.*

UNUM had a new vocational consultant, Richard Byard, review the information and arguments put forward by Plaintiff's counsel regarding his occupational requirements. UA 2641–44. Byard reviewed "initial vocational documents from 1996, noting they reflected that Plaintiff was a "Pest Control Sales Representative." *Id.* Byard noted that "[w]hile there appears to have been some inconsistency in the prior assessments of the climbing and crawling requirements of the insured's occupation, the overall material and substantial duties of the work have been consistently portrayed across each of the relevant vocational documents." *Id.* Byard stated that "it is reasonable to conclude that the physical demands of the insured's own occupation would

---

[6] The letter refers to Redd Pest Control as "Miller the Killer," though notes it underwent two ownership changes. UA 2536. UNUM does not apparently disputed the executive assistant worked at Redd Pest Control. *See* UA 2657.

include" frequent sitting, reaching, handling, and fingering, and occasional standing, walking, stooping, crouching, crawling, climbing, and lifting/exerting force up to 20 pounds. *Id.* Byard noted that the occasional stooping, crouching, crawling, and climbing activities would be performed "across a variety of residential and commercial properties involving varying access to rooftops, attic spaces, eaves, basements, crawlspaces, and other difficult to reach locations behind and/or above equipment, machinery, and appliances." *Id.* Byard's report does not clearly indicate whether his conclusion about the physical demands of Plaintiff's occupation is at odds with the description provided by Giese—which was apparently relied upon by both Dr. Krell and Dr. Sentef in their reports on Plaintiff's ability to return to his occupation—but does state that the job description listing sent by Plaintiff's counsel regarded the occupation of "Pest Exterminator," which was distinct from Plaintiff's employment. *Id.*

On September 24, 2014, UNUM sent notice to Plaintiff's counsel that it would uphold its prior decision to terminate benefits. UA 2653–58. The letter summarizes its initially stated reasons for terminating benefits, then discusses the Byard's review of job requirement information that was provided by Plaintiff's counsel in July 2014. *Id.* The letter acknowledges the former Redd Pest Control executive assistant's letter regarding Plaintiff's job duties, but nonetheless asserted:

> There is no documentation to support [Plaintiff] was anything other than a pest control sales representative. His employer consistently reported he was a salesman. A letter from the Director of Human Resources, James Waitress[7] dated November 6, 1996; further confirmed [Plaintiff] was a salesman. It states he sold both pest control and termite work, which is of course different from actually performing the pest and termite work. The letter from Mr. Waitress further notes [Plaintiff] did have to bend, crawl, stoop, climb and reach. We have acknowledged his need to do these things.

---

[7] The Court notes that UNUM apparently misspelled the name of James R. Waltress. *See* UA 2395–97.

*Id.* Addressing the asserted lack of context regarding the surveillance footage of Plaintiff, UNUM asserted, "[t]o that end, there is nothing in [Plaintiff's] records to suggest he has had any urgent follow up appointments with Dr. Keating or in an emergency room." *Id.*

*D. UNUM's Claim for Overpayment*

In August 2013, UNUM initiated an investigation into Plaintiff's personal and business tax returns to determine if UNUM was properly calculating the amount of benefits due to Plaintiff, based on Plaintiff's reports about his landscaping business. UA 744–45. UNUM's investigation indicated that Plaintiff was the sole shareholder of T. Marcades, Ltd., paid rent on a 2006 Chevy pickup and franchise fees to Plaintiff, which Plaintiff reported as rental and royalty income. *Id.* Making certain stated assumptions about Plaintiff's income, the investigation report estimated that Plaintiff had been overpaid by $26,145 for the years of 2011, 2012, and 2013. *Id.*

On August 19, 2013, UNUM sent a notice to Plaintiff explaining its decision to reduce Plaintiff's benefit payment based on Plaintiff's partial earnings. UA 809–12. UNUM further acknowledged the Plaintiff's accountant had been in communication with UNUM regarding Plaintiff's financial information and requested that Plaintiff have the accountant provide all updated information as soon as possible, so that UNUM could finalize its benefits calculation. *Id.* Following an internal review and receipt of updated information from Plaintiff, UNUM notified Plaintiff's counsel of its final determination regarding a benefit deduction of $18,039.19 for "work-related earnings" on February 26, 2014. UA 1487–91. The notification stated:

> [Plaintiff] has reported a franchise fee on his Schedule E as royalty income, paid for the use of his name. The franchise expense is not a loss due to disability and has been included as earnings in our calculation. We have considered your letter of October 10, 2013. However, we continue to find it reasonable that the earnings reported as franchise fee are, in fact, earnings. There is little information to support such a fee. The amount of this fee has fluctuated since 2006. You have provided an explanation, on behalf of [Plaintiff], that this fluctuation was due to [Plaintiff's] corporation being unable to pay a franchise fee. We would not expect that a

legitimate franchise fee would be subject to the kind of fluctuations shown in [Plaintiff's] tax returns.

*Id.* The notification also surveys IRS guidelines which UNUM asserted indicated that Plaintiff improperly designated the monies as fees instead of compensation in return for services. *Id.* UNUM notified that, if Plaintiff failed to repay the overpayment by March 31, 2014, UNUM would begin further deducting Plaintiff's monthly benefit payments and that UNUM's efforts to recoup overpayment would not be stayed in the case Plaintiff appealed UNUM's decision. UA 1548.

On May 9, 2014, Plaintiff appealed UNUM's decision. UA 1607–13. Plaintiff's counsel asserted that the Policy does not define earnings as including franchise fees and that UNUM improperly relied on IRS guidelines and Plaintiff's tax returns to come to its conclusions that the amounts in question constituted earnings. *Id.* Specifically, Plaintiff's counsel argued that UNUM was bound under Louisiana law to follow only the language in the Policy and that any ambiguity in the Policy must be resolved in favor of the insured. *Id.* Plaintiff's counsel asserted that UNUM's overpayment determination was made in bad faith. *Id.*

On July 3, 2014, UNUM notified Plaintiff's counsel of its determination to uphold its overpayment determination. UA 1677–80. UNUM asserted that the Policy did not place limits on how UNUM determined post-disability earnings of Plaintiff and asserted this was particularly true where Plaintiff "in essence is not paying himself in a traditional manner." *Id.*

*E. Procedural Posture*

Plaintiff filed this suit on April 10, 2015. Rec. Doc. 1. On April 12, 2016, the Court granted a joint motion of the parties to submit the case for final judgment based upon the administrative record. Rec. Doc. 22. The parties' joint motion stipulated that all of Plaintiff's claims arise under Employee Retirement Income Security Act ("ERISA"). Rec. Doc. 21. The

parties filed their cross-motions for final judgment on July 1, 2016, and their replies on July 18, 2016. *See* Rec. Docs. 26, 27, 30, 31, & 32.

## II. ANALYSIS

ERISA authorizes federal courts to review determinations made by employee benefit plans, including disability plans. *See* 29 U.S.C. § 1132(a)(1)(B). Courts review the administrator's decision for abuse of discretion, inquiring whether or not there is "substantial evidence" in the record to support the administrator's decision. *See Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007). This review determines whether or not the administrator's decision was arbitrary and capricious. *See id*. Similarly, ERISA disputes centering on the plan administrator's interpretation of plan terms require courts to determine not whether the administrator employed the legally correct interpretation of the plan, but rather whether the administrator abused its discretion in interpreting the plan. *See Pylant v. Hartford Life and Acc. Ins. Co.*, 497 F. 3d 536, 540 (5th Cir. 2007) (internal citation omitted).

Where, as here, the plan administrator also pays the benefits in dispute, "a structural conflict of interest exists." *See Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 248 (5th Cir. 2009). Courts in the Fifth Circuit previously employed a potentially less deferential "sliding scale standard" of review in such cases. *See Gothard*, 491 F.3d at 249. Following the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2344, 2351 (2008), the Fifth Circuit joined other circuits in abandoning the "sliding scale standard" in favor of a uniform abuse of discretion standard, which accounts for the conflict of interest only as a factor to be considered during analysis of the record. *See Holland*, 576 F.3d at 248 n.3.

Accordingly, if the record indicates "procedural unreasonableness," a court should give the conflict of interest significant consideration. *See Schexnayder v. Hartford Life and Acc. Ins.*

16

*Co.*, 600 F.3d 465, 469 (5th Cir. 2010); *see also Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 311–12 (5th Cir. 2015). To determine whether to give the plan administrator's conflict of interest more weight, a court may inquire whether "whether the method by which the plan administrator made the decision was unreasonable" or whether the "administrator has a history of biased claims administration." *See Truit v. Unum Life Ins. Co. of Amer.*, 729 F. 3d 497, 510 (5th Cir. 2013) (internal quotation omitted); *Holland*, 576 F. 3d at 248–49 (quoting *Glenn*, 128 S. Ct. at 2351). However, the court should also factor in any steps taken by the administrator to reduce potential bias and promote accuracy. *Holland*, 576 F. 3d at 248–49. Absent a finding of procedural unreasonableness, the conflict of interest should be only a "minimal factor" in the court's abuse of discretion review. *See Schexnayder*, 600 F.3d at 469*; see also Holland*, 576 F.3d at 247 n.3.

In his final judgment memoranda, Plaintiff makes no express argument as to any procedural unreasonableness under Fifth Circuit authority. *See* Rec. Docs. 26-1 & 31. The Court notes that UNUM has twice before cut off Plaintiff's benefits; however, reinstated those benefits through its own internal appeal process. Furthermore, and as discussed below, there are questionable aspects of how UNUM went about terminating Plaintiff's benefits in 2014. The Court, however, does not find it necessary to decide whether, in this case, there is a history of biased claims administration or an indication that the method by which UNUM reached its decision was unreasonableness. As such, the Court views the structural conflict of interest in this case as only a minimal factor.

**A. Was UNUM's Decision to Terminate Plaintiff's Benefits Backed by Substantial Evidence?**

Plaintiff essentially puts forward two arguments in support of its contention that UNUM lacked substantial evidence when it made the decision to terminate Plaintiff's benefits. *See* Rec. Docs. 26-1 & 31. First, Plaintiff argues that UNUM failed to obtain any medical evidence from a physician who actually evaluated Plaintiff before deciding to discredit the opinion of Plaintiff's treating physician. Second, Plaintiff argues that UNUM, rather than using the occupational requirements established in the record, considered less demanding occupational requirements when deciding Plaintiff was capable of performing each of the material duties of his occupation at Redd Pest Control.

As to Plaintiff's first argument, UNUM asserts that ERISA does not impose upon it a heightened burden of explanation for rejecting the opinion of Dr. Keating. *See* Rec. Doc. 30-1 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965, 1966 (2003)). UNUM accurately states the law and, furthermore, the Fifth Circuit has clearly established that a plan administrator may adopt a consulting physician's opinion over a treating physician's opinion, even where the consulting physician review only the claimant's medical records and performed no physical examination of the claimant. *See Gothard v. Metro. Life Ins. Co.*, 491 F. 3d 246, 249–50 (5th Cir. 2007); *Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 335 (5th Cir. 2001). As such, the Court finds Plaintiff's first argument unpersuasive. While the record review medical opinions of Dr. Krell and Dr. Sentef do not per se constitute substantial evidence supporting UNUM's termination of Plaintiff's benefits, the fact that UNUM did not have an independent medical examiner evaluate Plaintiff is not alone sufficient to conclude UNUM did not terminate benefits on substantial evidence.

Plaintiff's second argument requires much more careful examination. Plaintiff argues that UNUM applied its evidence regarding Plaintiff's capabilities to an errant, and less demanding, description of Plaintiff's pre-disability occupation. Rec. Doc. 26-1 at 8. Plaintiff emphasizes that UNUM overturned its 1996 decision to terminate Plaintiff's benefit after it concluded that its classification of Plaintiff as a "Pest Control Salesperson" and its description of that occupation's physical requirements did not actually accord with Plaintiff's actual occupational requirements. *Id.*

UNUM asserts that its vocational consultant identified Plaintiff's occupation as "light duty," requiring lifting of up to twenty pounds, occasional stooping and crouching, frequent reaching, handling, fingering, talking and hearing. Rec. Doc. 30-1 at 39; *see* UA 2641–44. UNUM asserts that its use of the Dictionary of Occupational Titles in developing this description of Plaintiff's occupational requirements, means its description "represents extensive fact gathering and detailed data analysis. *Id.* (citing *Osborne v. Hartford Life and Accident Ins Co.*, 465 F. 3d 296, 299 (6th Cir. 2007)). UNUM asserts that it would have been reasonable for it to simply rely on the Dictionary of Occupational Titles' description of a pest control sales representative, but that UNUM exceeded its obligation to reasonably conclude that Plaintiff could return to work by adding in crawling and climbing requirements reported to UNUM "[a]t some point" by Redd Pest Control. Rec. Doc. 30-1 at 39. UNUM asserts it identified substantial evidence to conclude that Plaintiff "was able to engage in the additional job requirements noted by his employer of crawling and climbing on a ladder to go into an attic." *Id.*

Beyond that, UNUM asserts that it "has consistently rejected [Plaintiff's] attempts to re-designate his occupation to one with more stringent physical requirements." Rec. Doc. 32 at 1. UNUM asserts that the:

> physical demands are described as (1) regularly required to talk or hear; (2)
> frequently required to walk; use hands to finger, handle, or feel objects, tools, or
> controls; and stoop, kneel, crouch or crawl. The employee is occasionally required
> to stand, reach with hands and arms, climb or balance, and taste or smell; (3)
> frequently lift and/or move up to 10 pounds and occasionally lift and/or move up
> to 25 pounds.

*Id.* at 2 (citing UA 2395–97). UNUM asserts that UNUM's 2013 vocational consultant reasonably used this description to follow the Dictionary of Occupational Titles' definition of Pest Control Sales Representative, which lists the following physical demands:

> frequent sitting with occasional standing and walking; occasional exertion in the
> light demand work capacity (10-20 lbs.); frequent reaching (occasional upward and
> downward), handling and fingering and stooping and crouching on an occasional
> basis, which is required to perform residential inspections.

*Id.* at 3 (citing UA 253–56). UNUM asserts that these descriptions "are essentially the same," except that the Dictionary of Occupational Titles description does not list crawling as a requirement of the job. *Id.* UNUM asserts this record clearly countervails Plaintiff's assertion that his job demands were significantly more stringent and notes that it had a second vocational consultant review the job listings submitted by Plaintiff in his appeal to confirm that they do not accord with the record. *Id.* at 4.

UNUM further asserts that, even if the physical requirements of Plaintiff's position were actually more demanding than the Dictionary of Occupational Titles' description, UNUM is entitled to follow the Dictionary of Occupational Titles rather than defer to the case specifics of Plaintiff's occupational duties. *Id.* at 4–6 (citing *Pylant v. Hartford Life & Acc. Ins. Co.*, 497 F. 3d 536, 540 (5th Cir. 2007) (internal citation omitted); *House v. Am. United Life Ins. Co.*, 499 F. 3d 443, 453 (5th Cir. 2007). Finally, UNUM points to the updated reports of Dr. Krell and Dr. Sentef, which it assert demonstrate that Plaintiff could meet his employer's requirements of crawling and climbing. *Id.* at 9.

The Court is not persuaded by UNUM's argument that it would have been reasonable to rely solely on the Dictionary of Occupational Titles to substantially alter the description of Plaintiff's job occupation, after UNUM apparently settled its definition of Plaintiff's occupational requirements by its own review process in 1996. Furthermore, the Court is not persuaded that the apparently hurried and report updates of Dr. Krell and Dr. Sentef—made in response to an inquiry about new listing of Plaintiff's job requirements that included frequent crawl and in light of a six-minute video that shows Plaintiff at one point on his hands and knees––constitute substantial evidence that Plaintiff was able to meet his employer's requirements of frequent crawling.

The record is clear that, at the time UNUM made its first substantial determination of Plaintiff's occupational requirements, one such requirement was frequent crawling. UA 2199. Indeed, while the record shows some inconsistency over how UNUM understood the stooping, crouching, and climbing requirements of Plaintiff's occupation,[8] the record shows that UNUM effectively acquiesced to its own vocational consultant's description of Plaintiff's job as requiring "frequent kneeling, stooping, and crawling (40-50 & job duties. Crawling is required in virtually all residential inspections.)." UA 2199. Yet, the vocational report of Giese—which at least initially was an important piece of UNUM's post-2012 evidentiary basis for terminating Plaintiff's benefits—altogether omitted crawling as one Plaintiff's occupational requirements[9] and the initial file review medical opinions of Dr. Krell and Dr. Sentef did not address Plaintiff's capacity to crawl.[10]

---

[8] UA 1894–1903; UA 2016–17; UA 2199.
[9] UA 255.
[10] UA 1583–86; UA 1588–93. The Court notes that it is not ruling that Plaintiff's depiction of his occupational requirements on appeal from UNUM's 2014 termination of benefits—nor Byard's description which listed crawling as an "occasional" requirement—is correct, but rather that UNUM must follow the description of Plaintiff's job to which it has already effectively acquiesced.

The Court does not dispute that a plan administrator may properly rely on the Dictionary of Occupational Titles where there are ambiguities surrounding the actual requirements of the claimant's specific occupation; however, that says nothing about a plan administrator's authority to "move the yardstick" on the requirements of a claimant's pre-disability occupation after the record clearly demonstrates that the administrator effectively acquiesced to a given list of occupational requirements. UNUM's citation to Fifth Circuit precedent is unavailing. In *Pylant v. Hartford Life & Acc. Ins. Co.*, 497 F. 3d 536, 540 (5th Cir. 2007), the court ruled that an administrator reasonably relied on the Dictionary of Occupational Titles to define the requirements of a "Technical Writer," where there was a threshold and previously unaddressed dispute over what the claimant claimed her job actually required. *See id.* at 540.The *Pylant* court noted with favor the district court's reasoning that reference to the "Dictionary of Occupational Titles was appropriate because insurers issuing disability policies cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or he occupation." *Id.* (internal quotation omitted).

In *House v. Am. United Life Ins. Co.*, 499 F. 3d 443, 453 (5th Cir. 2007), the Fifth Circuit reversed a district court decision that found a distinction between the requirements of a trial lawyer and a lawyer, noting that courts often interpret "'regular occupation' as meaning a general occupation rather than a particular position with a particular employer." *Id.* The *House* court noted that it was appropriate, given the interpretive discretion afforded to administrators, to defer to the administrator's interpretation of the claimant's occupation. *Id.* at 454. While the Court does not find it necessary to survey the extensive non-binding authority cited to by UNUM, the Court notes that a review of the precedent does not support UNUM's position in this case, which is that an administrator may effectively establish one definition of a claimant's

occupation and then alter at a later date based solely on the Dictionary of Occupational Titles (and despite past and present record evidence to the contrary). *Cf., e.g.*, *Osborne v. Hartford Life and Acc. Ins. Co.*, 465 F.3d 296, 299–300 (6th Cir. 2006); *Cross v. Reliance Standard Life Ins. Co.*, Civ. A. No. 06-3507, 2007 WL 1191808 at *5*6 (E.D. La. Apr. 20, 2007) (Africk, J.).

Before terminating Plaintiff's benefits, UNUM did obtain additional surveillance footage and requested updated reports from Dr. Krell and Sentef to address a new description of Plaintiff's occupation which required, among other items, frequent crawling.[11] Those updated medical reports—which as to crawling are apparently based on a six-minute video showing Plaintiff conducting certain yardwork activities and at one point moving on his hands and knees around a bush—contain facially inconsistent statements that call their reliability into question. On the same page of his report, Dr. Krell at one point opines that Plaintiff would not be prohibited from "occasional performance" of frequent crawling and then, without explanation, soon after states Plaintiff could perform frequent crawling on a "sustained, full-time basis."[12] His statement about Plaintiff's ability to perform frequent crawling on a "sustained, full-time basis" ends with a question mark, which at best indicates that Dr. Krell copied and pasted UNUM's report prompt as his medical opinion. *Compare* UA 1584, *with* UA 1586. Dr. Sentef's initial review of Dr. Krell's updated report stated that he concurred with Dr. Krell, but his listing of what Plaintiff was physically capable of performing did not include crawling. UA 1593. The Court questions the credibility of Dr. Sentef's single-paragraph update of his initial updated review that again rather clearly copied and pasted UNUM's stated prompt as his medical opinion, without any elaboration. UA 1600–1601.

---

[11] UA 1583–1601.
[12] UA 1586.

23

Where UNUM has been inconsistent in defining Plaintiff's occupational requirements—after apparently acquiescing to a definition that requires frequent crawling in 1996—and where there is significant countervailing medical evidence—principally, from both Dr. Keating and from UNUM's own independent medical examiner, Dr. McCain—the Court is not persuaded that Dr. Krell and Dr. Sentef's equivocal, updated record review reports constitute substantial evidence that Plaintiff can crawl on a frequent basis. Despite the report's date and Dr. McCain's general concerns about Plaintiff's self-reporting, Dr. McCain stated unequivocally "[w]ith regards to crawling, [Plaintiff] would certainly be unable to perform [his previous job as a termite inspector] with the history of possible instability in his lumbar spine." UA 1876–83.[13] The Court is not persuaded that two equivocal and apparently hurried record reviews of a six-minute surveillance video that at one point shows Plaintiff on his hands and knees could constitute substantial evidence of Plaintiff's capacity to frequently crawl on a sustained, full-time basis. This is particularly the case where the record otherwise indicates that Plaintiff has undergone two significant spinal operations, has a disk herniation, and has been diagnosed by both his own doctors and one of UNUM's doctors in a manner that seriously calls into question his ability to frequently crawl.

The Court does not discount the possibility that UNUM might obtain additional medical evidence or other additional evidence supplying sufficiently substantial evidence of Plaintiff's capacity to frequently crawl on a sustained, full-time basis. On the current administrative record, however, the Court cannot conclude that there is substantial evidence of such a capacity. Accordingly, UNUM's decision to terminate Plaintiff's monthly benefits must be overturned.

---

[13] The Court acknowledges that around the same time of Dr. McCain's report, Christine Rangel, an occupational therapist concluded that Plaintiff could tolerate *occasional* crawling. UA 1894–1903. Given that the pertinent inquiry is whether Plaintiff can *frequently* call and Dr. McCain's independent medical opinion that Plaintiff cannot crawl, the Court is not persuaded that Rangel's conclusion is particularly relevant to the issue before the Court.

**B. Did UNUM Appropriately Reduce Plaintiff's Benefits Based on Funds Received in Relation to Landscaping Business?**

While the Court finds that UNUM abused its discretion in terminating Plaintiff's benefits altogether, it does not find persuasive Plaintiff's arguments that UNUM abused its discretion by reducing the amount of Plaintiff's benefits based on UNUM's reasoned determination that the "franchise fee" Plaintiff was receiving from his wholly held corporation actually constituted earnings. Plaintiff would have this Court hold that the Policy's definition of earnings would have to include "franchise fees" in order for UNUM to have properly reduced Plaintiff's benefits; however, ERISA imposes no such burden on UNUM. Instead, the Court looks to whether UNUM interpreted the Policy's provisions for reducing benefits based on Plaintiff "earning more than 20% of his indexed pre-disability earnings in his regular occupation or another occupation." UA 282; *see Pylant*, 497 F. 3d at 540.

Even assuming that UNUM did employ the legally correct definition of "earnings" by using a common-sense understanding of Plaintiff's non-traditional method of paying himself from his wholly held corporation and referencing IRS guidelines, the Court cannot conclude that UNUM abused its discretion by doing so. As such, the Court leaves undisturbed UNUM's decision to make Plaintiff repay overpayments calculated based on Plaintiff's receipt of "franchise fees."

**C. Attorneys' Fees**

"ERISA provides that '[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.'" *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability*

*Plan*, 493 F.3d 533, 541–42 (5th Cir. 2007) (quoting 29 U.S.C. § 1132(g)(1)). The Fifth Circuit

has explained that:

> The following five factors [are] enumerated for consideration in ERISA cases when shifting attorney's fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position.

*Id.* at 542 n.6 (quoting *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.

1980)). In evaluating the proceedings before it, this Court finds that an award of fees would be

inappropriate. While this Court is partially overturning the administrator's denial, the

administrator did provide an explanation of UNUM's reasons for denial. *See Servat v. Amer.*

*Heritage Life Ins. Co.*, Civ. A. No. 04-2928, 2007 WL 2480342, at *21 (E.D. La. Aug.28, 2007)

(Engelhardt, J.) (awarding attorneys' fees where defendant "failed to adequately explain its

reasons for its denial [and] failed to fairly explain the type of information required to prove a

claim under its policy"); *see also Burdett v. UNUM Life Ins. Co. of Amer.*, Civ. A. No. 06-6138

at *15 (E.D. La. Sept. 30, 2008) (Duval, J.). No persuasive evidence of bad faith by either party

has been presented here, and there appears no need for any deterrence of culpable conduct. This

Court therefore will not award attorneys' fees.

**III. CONCLUSION**

For the reasons stated herein,

      **IT IS ORDERED** that Plaintiff's motion for final judgment based upon the administrative record is **GRANTED IN PART** and **DENIED IN PART** in that the Court orders UNUM to reinstate monthly disability payments, but leaves undisturbed UNUM's determination that Plaintiff must repay overpayment of benefits based on Plaintiff's receipt of "franchise fees." Rec. Doc. 26.

      **IT IS ORDERED** that UNUM's motion for final judgment based upon the administrative record is **GRANTED IN PART** and **DENIED IN PART** for the same reasons stated above. Rec. Doc. 30.

      New Orleans, Louisiana**,** this 18th day of August, 2016.

                            _____
                            **STANWOOD R. DUVAL, JR.**
                            **UNITED STATES DISTRICT JUDGE**